UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| INTERMAX TOWERS, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>ADA COUNTY, IDAHO; BOARD OF ADA COUNTY COMMISSIONERS; AND TOM DAYLEY, ROD BECK, and RYAN DAVIDSON, each in his official capacity as a Commissioner on the Board of Ada County Commissioners,<br><br>        Defendants. | Case No. 1:23-cv-00127-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Plaintiff Intermax Towers, LLC, filed this action against Defendants Ada County; Board of Ada County Commissioners; and Commissioners Tom Dayley, Rod Beck, and Ryan Davidson, challenging the denial of Intermax's conditional use permit application to construct a cellphone tower. Pending before the Court is Defendants' Motion to Dismiss [Intermax's] Complaint for Declaratory and Injunctive Relief. (Dkt. 12). Under Idaho Local District Rule 7.1(d)(1)(B), the Court finds oral argument is not necessary to resolve these matters. *See also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons discussed below, the Court denies the motion.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

### A. Intermax's Proposed Facility

According to Intermax's allegations, Intermax "constructs, owns, and manages tower assets and wireless infrastructure," which it leases to wireless carriers. (Dkt. 1 at ¶ 10). This case involves Intermax's application for a conditional use permit to construct a wireless tower, "in the form of a monopole tower," at 5410 West Beacon Light Road in Eagle, Ada County, Idaho ("Beacon Light property"). Intermax alleges it intends to lease the tower to wireless carriers, like Verizon, to place their antennas for the purpose of providing personal wireless service to end-users. Intermax refers to the proposed project as a "wireless communications facility" or "personal wireless service facility" (hereafter "proposed facility").

For a wireless network to perform adequately, a personal wireless service facility ("PWSF") must be located, constructed, and operated so a wireless carrier can achieve reliable service for its customers. (*Id.* at ¶ 12). To provide reliable service, PWSFs' coverage must overlap in a grid pattern resembling a honeycomb. (*Id.* at ¶ 11). To determine where a new or replacement PWSF is required, radio frequency engineers use various techniques to complete a field propagation study showing where PWSFs need to be located to provide reliable service. (*Id.* at ¶ 12). If there is no functioning PWSF in a particular area, then no reliable service will be available in that area, causing customers who live or travel in the area to experience dropped calls, connection failures, and potentially an inability to make 911 emergency calls. (*Id.*).

According to Intermax, if it cannot construct its proposed facility within a specific geographic area, then the wireless carriers it serves, like Verizon, will not be able to provide wireless service to consumers within that area. (*Id.* at ¶ 11). Verizon currently owns and operates wireless antennas located on an existing PWSF, which it leases on a dilapidated farming silo ("Silo

Facility") near the Beacon Light property. (*Id.* at ¶ 13). Based on the research and analysis of radio frequency engineers, Verizon determined it currently has a significant gap in its coverage, i.e., in its ability to provide wireless services in the Silo Facility area, despite having antennas located on that facility. (*Id.* at ¶¶ 14, 15).

This significant coverage gap will only worsen in the future based on at least two factors. First, the existing gap, which is based on the current population and vehicle traffic, will worsen as the area continues to develop. (*Id.* at ¶¶ 14, 18). Second, Verizon's lease for its antennas on the Silo Facility expired in March 2021, and its antennas only remain on the Silo Facility under a month-to-month holdover tenancy. (*Id.* at ¶ 16). This holdover tenancy is subject to the owner's termination at any time with thirty days' notice. (*Id.*) If Verizon is forced to remove its antennas on the Silo Facility, Verizon will have an even more significant coverage gap in the area. (*Id.* at ¶¶ 16, 17).

To remedy Verizon's significant gap in coverage, its radio frequency engineers established a search area to develop a replacement PWSF onto which Verizon could relocate its wireless antennas from the Silo Facility, and Verizon provided that information to Intermax. (*Id.* at ¶ 21). Based on the search area, Intermax conducted its own investigation to locate suitable properties potentially appropriate for the proposed facility. (*Id.* at ¶ 22). An appropriate property would have to meet several criteria, including being leasable and buildable, complying with local zoning standards and dimensional requirements, and curing the significant gap in service. (*Id.*).

After investigating and ruling out multiple properties for the proposed facility, Intermax identified the Beacon Light property, which meets the necessary criteria: It is within the search area Verizon's radio frequency engineers identified; it is in a zoning district allowing a PWSF subject to a conditional use permit; it is large enough for Intermax to construct its proposed facility

**MEMORANDUM DECISION AND ORDER - 3**

and to comply with the minimum setback requirements; it has a property owner who is willing to lease a portion of the land for construction of the facility; and it is otherwise suitable for constructing and maintaining a facility. (*Id.* at ¶ 23).

## B. Intermax's Conditional Use Application

In October 2021, Intermax applied for a conditional use permit from Ada County to construct and operate the proposed facility on the Beacon Light property. Verizon intends to use the proposed facility to remedy the current coverage gap in the area. Additionally, while Intermax's application was pending, AT&T also identified a significant coverage gap in its wireless services near the proposed facility and has expressed interest in locating its antennas onto the facility.

On March 10, 2022, the Ada County Commission held its public hearing on Intermax's application. During that hearing, Intermax presented supporting evidence and testimony and answered questions from members of the Commission. Also, residents opposed to Intermax's application appeared at the hearing and others submitted e-mail comments. Intermax alleges their "opposing comments consisted of vague, generalized, and unsupported concerns about the property values of surrounding lands, the obstruction of certain views and aesthetic concerns, and fears of alleged potential health effects of [radio frequency] emissions." (Dkt. 1 at ¶ 33). After closing the hearing, the Commission voted to approve Intermax's application and to issue the requested conditional use permit.

On March 25, 2022, a resident who opposed Intermax's application appealed the Commission's approval of the application to the Board of Ada County Commissioners. A public hearing was scheduling for July 13. Before that hearing, County staff issued a staff report to the Board recommending the Board uphold the Commission's approval of Intermax's application and

deny the appeal. Both Intermax and the appellant presented evidence at the hearing, and the Board voted to table the matter to allow Intermax to provide additional information regarding other potential locations which it had ruled out and to give County staff time to hire an independent consultant to help the Board understand the technical aspects of Intermax's application.

On September 14, 2022, the Board again heard the appeal of Intermax's approved application. At the end of the hearing, the Board requested additional information from Intermax and voted to remand Intermax's application back to the Commission for further fact-finding and additional consideration. On October 3, Intermax submitted to the Commission the additional, requested materials and information, and another public hearing was scheduled for November 17.

At that hearing, Intermax and its opponents presented additional evidence. According to Intermax, its opponents' comments again "consisted of vague and generalized worries and concerns about property values of surrounding lands, obstruction of certain views and aesthetic concerns, and alleged potential health effects of [radio frequency] emissions." (Dkt. 1 at ¶ 53). Following the Commission's November 17 hearing, the appellant's appeal was scheduled before the Board for another public hearing on January 4, 2023.

During that hearing, the "County's independent consultant" recommended upholding the Commission's approval of Intermax's application and denying the appeal; Intermax offered further evidence and comment; and its opponents again raised "the same vague, generalized, and unsupported worries and concerns about property values of surrounding lands, obstruction of certain views and aesthetic concerns, and alleged potential health effects of [radio frequency] emissions." (Dkt. 1 at ¶ 56). According to Intermax, its opponents "never presented any competent and substantial evidence disputing the existence of a significant gap" in Verizon's wireless service

MEMORANDUM DECISION AND ORDER - 5

near the Beacon Light property, despite that the permitting process lasted over a year and included numerous public hearings. (*Id.* at ¶ 58).

After the Board closed the January 4, 2023, public hearing, the Board voted 2-0 to approve the appeal, with Chairman Beck abstaining, and reversed the Commission's approval of Intermax's application. On January 17, the Board issued its factual findings; Intermax then requested reconsideration of the Board's decision; and on February 28, the County denied Intermax's application as its final action.

## C. Intermax's Complaint

On March 29, 2023, Intermax timely filed its complaint under the Telecommunication Act of 1996 (TCA). Specifically, Intermax challenges Defendants' denial of Intermax's application for a conditional use permit for its proposed facility. In its complaint, Intermax alleges Defendants' denial violates the TCA because the denial has the unlawful effect of prohibiting the provision of personal wireless services and was not based on substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(i)(II) (making effective prohibition unlawful); § 332(c)(7)(B)(iii) (requiring substantial evidence). Intermax seeks a declaratory order that Defendants violated the TCA and injunctive relief mandating the issuance of a conditional use permit allowing Intermax to construct its proposed facility.

Defendants move to dismiss Intermax's complaint under Rule 12(b) of the Federal Rules of Civil Procedure. Their challenge is three-fold. They argue that this Court lacks subject-matter jurisdiction; Intermax failed to join an indispensable party; and it failed to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(1) (addressing jurisdiction); 12(b)(6) (addressing failure to state claim); and 12(b)(7) (addressing failure to joint indispensable party). For the reasons discussed below, the Court denies the motion.

**MEMORANDUM DECISION AND ORDER - 6**

## LEGAL STANDARD

### A. Rule 12(b)(1) Subject-Matter Jurisdiction

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction. The plaintiff bears the burden of establishing subject-matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A jurisdictional challenge may be facial or factual. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Id.* "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.*

### B. Rule 12(b)(6) Failure to State a Claim

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. A court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Even under the liberal pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### C. Rule 12(b)(7) Failure to Join an Indispensable Party

Rule 12(b)(7) permits a party to move to dismiss a complaint for failure to join a party who is indispensable under Rule 19 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(7); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1458 (9th Cir. 1994). Rule 19 "governs compulsory party joinder in federal district courts." *E.E.O.C. v. Peabody W. Coal Co.*

("*Peabody I*"), 400 F.3d 774, 778 (9th Cir. 2005). When determining whether a dismissal is appropriate under Rule 12(b)(7), the court undertakes "three successive inquiries" under Rule 19. *Peabody I*, 400 F.3d at 779. These inquiries include determining whether a nonparty is necessary; if so, whether its joinder is feasible; and if not, whether it is an indispensable party. *Id.* at 779-80.

The inquiry is practical, fact-specific, and is designed to avoid the harsh results of rigid application. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). When considering a motion to dismiss under Rule 12(b)(7), the court accepts as true the allegations in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *Paiute-Shoshone Indians of Bishop Cmty. of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 996 n.1 (9th Cir. 2011). The court may, however, consider evidence outside of the pleadings. *See McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960). "The moving party has the burden of persuasion in arguing for dismissal" for failure to join. *Makah Indian Tribe*, 910 F.2d at 558.

## ANALYSIS

### A. Subject-Matter Jurisdiction

As an initial matter, the Court addresses whether Defendants' subject-matter jurisdiction challenge under Rule 12(b)(1) is a facial or factual challenge. Defendants compare their Rule 12(b)(1) challenge to a factual challenge. (See Dkt. 12-1 at p. 4). They do not, however, submit any affidavits or other evidence challenging the truthfulness of Intermax's jurisdictional or other allegations. As a result, their challenge is not a factual challenge as they suggest; rather, it is a facial challenge. In resolving a facial challenge such as Defendants', the Court accepts the Plaintiff's allegations as true. *See Leite*, 749 F.3d at 1121 (noting court accepts allegations as true when resolving facial attack on jurisdiction).

MEMORANDUM DECISION AND ORDER - 8

### 1. Intermax's Claims under § 332(c)(7) Invoke Federal Subject-Matter Jurisdiction

By way of background, Congress passed the TCA to facilitate the development of a national wireless communications system, unhampered by an inconsistent patchwork of state and local wireless regulations. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127-28 (2005) (Breyer, J., concurring). The TCA aims to develop wireless infrastructure by removing local regulatory barriers. *Id*. Congress also recognized, however, that state and local governments have a legitimate interest in regulating the siting of wireless facilities including, for example, the aesthetic values and the costs associated with the use and maintenance of public rights-of-way. *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 407 (3d Cir. 1999). To balance these competing interests, the TCA "generally preserves the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers, but imposes specific limitations on that authority." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015); *City of Rancho Palos Verdes*, 544 U.S. at 115.

Section 332(c)(7)(B) of the TCA imposes some of these limitations on local authorities regarding the placement, construction, and modification of PWSFs. 47 U.S.C. § 332(c)(7)(A); (c)(7)(B)(i). Two of these limitations include that a local government's denial of a request to construct a PSWF "shall not prohibit or have the effect of prohibiting the provision of personal wireless services" and that substantial evidence shall support a denial of a request to construct a PSWF. 47 U.S.C. § 332(c)(7)(B)(i)(II); 47 U.S.C. § 332(c)(7)(B)(iii). To enforce these and other limitations, the TCA creates a private right of action. Specifically, it authorizes "any persons adversely affected by any final action" implicating these limitations to seek judicial review. 47 U.S.C. § 332(c)(7)(B)(v).

**MEMORANDUM DECISION AND ORDER - 9**

In this case, Intermax relies on § 332(c)(7)(B)(v) to assert claims that Defendants' denial of its application to construct its proposed facility effectively prohibits the provision of personal wireless services and is not supported by substantial evidence. (Dkt. 1 at ¶ 5). Defendants argue Intermax's reliance on § 332(c)(7)(B) is misplaced and "does not invoke [this Court's] jurisdiction" because "Intermax neither provides personal wireless services nor provides personal wireless facilities." (Dkt. 12-1 at p. 3; *see also* Dkt. 12-1 at p. 6) ("Intermax never asserts in its Complaint that . . . it is a personal wireless service provider or a personal wireless facility provider.").

Contrary to Defendants' argument, however, Intermax has alleged it provides PWSFs, which is the subject matter of the limitations in § 332(c)(7)(B). *See* 47 U.S.C. § 332(c)(7)(B) (regulating placement, construction, and modification of "personal wireless facilities" by local government). For example, Intermax alleges it applied "to construct a *wireless telecommunications facility* in the form of a monopole tower" on the Beacon Light property. (Dkt. 1 at p. 2 (emphasis added).) It also describes this proposed facility as a "*personal wireless service facility*." (*Id.* at ¶ 19) (emphasis added). Although Intermax does not always use the precise nomenclature of § 332(c)(7)(B)—i.e., "personal wireless service facilities"—its allegations establish it is a provider of PWSFs which applied to install a new PWSF, i.e., the proposed facility. Further, cellular phone towers, such as the one Intermax proposed for the Beacon Light property, are commonly known as PWSFs and are subject to § 322(c)(7)(B). *See, e.g.*, *T-Mobile*, 574 U.S. at 300 (considering whether § 332(c)(7)(B) "requires localities to provide reasons when they deny applications to build cell phone towers" and referring to "personal wireless service facilities" as "wireless communications facilities like cell phone towers."); *see also Green Mountain Realty*

**MEMORANDUM DECISION AND ORDER - 10**

*Corp. v. Leonard*, 750 F.3d 30, 33 (1st Cir. 2014) (noting "personal wireless communications facilities" are commonly known as "cell phone towers").

Accepting Intermax's allegations as true—including that it provides PWSFs—the face of its complaint makes clear the Court has federal subject-matter jurisdiction. Subject-matter jurisdiction refers to a court's power to decide a certain class of cases. Congress has authorized the federal district courts to exercise original jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "Most directly, a case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Here, Intermax alleges Defendants' final action in denying Intermax's conditional use permit application violated § 332(c)(7)(B)(i)(II) and (iii) of the TCA--a federal statute. It is therefore clear "from the face of the complaint" that federal question jurisdiction exists in this case. *Virgin v. Cnty. of San Luis Obispo*, 201 F.3d 1141, 1142-43 (9th Cir. 2000) ("A claim arises under federal law within § 1331 if it is apparent from the face of the complaint . . . that a federal law creates the plaintiff's cause of action.").

### 2. Intermax Has a Private Right of Action Under § 332(c)(7)(B)

To the extent Defendants are arguing Intermax is not among the individuals who have a private right of action under the TCA, that argument also fails. Defendants' argument that Intermax may not rely on § 332(c)(7)(B) does not actually raise a jurisdictional issue as they assert. Nor is the question one of standing as Intermax urges. Rather, Defendants' contention appears to be simply that the TCA does not provide a cause of action for Intermax. (*See, e.g.*, Dkt. 12-1 at p. 5) (arguing TCA "eliminated a cause of action for Intermax when information services were reclassified in the FCC's 2018 Order"). As the Supreme Court has made clear, however, this inquiry—i.e., whether a plaintiff "falls within a class of plaintiffs" for whom Congress has

authorized a cause of action—implicates neither federal question jurisdiction nor standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128, 128 n.4 (2014) (explaining absence of valid cause of action neither implicates standing nor subject-matter jurisdiction); *Crown Castle NG W. LLC v. Town of Hillsborough*, No. 18-CV-02473-JSC, 2018 WL 3777492, at *3 (N.D. Cal. Aug. 9, 2018) (explaining defendants' argument that plaintiff did not have cause of action under TCA was "one of statutory interpretation, not standing—prudential or otherwise").

In *Lexmark*, the Supreme Court clarified the two-part test for determining whether a plaintiff "falls within the class of plaintiffs" for whom Congress has authorized a cause of action. 572 U.S. at 128. First, the court "presume[s] a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 129 (quotation omitted). Determining "whether a legislative cause of action encompasses a particular plaintiff's claim" requires an analysis "using traditional tools of statutory interpretation." *Id.* at 127. Second, the court "presume[s] that a statutory cause of action is limited to plaintiffs whose injuries were proximately caused by violations of the statute." *Id.* at 132. The "[p]roximate cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 133.

In determining whether Intermax's interests fall within the zone of interests which § 332(c)(7)(B)(v) protects,[1] the Court considers the TCA's purpose. As explained above, in

---

[1] Section 332(c)(7)(B)(v) authorizes a cause of action for "any person adversely affected" by a local government's final action, and the TCA defines "person" expansively to include any "individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39). Defendants do not dispute that Intermax, a limited liability company, is a "person" under the TCA. Regardless, the Court considers whether Intermax's interests fall within the zone of interest § 332(c)(7)(B) protects and whether its alleged injuries were proximately caused by a violation of that provision. *See Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118,

enacting the TCA, Congress intended "to promote competition and higher quality in American telecommunications services and to encourage rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes*, 544 U.S. at 115 (internal citation and quotation marks omitted). "One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon *the installation of facilities for wireless communications, such as antenna towers*." *Id.* (emphasis added). As this language demonstrates, the TCA's protections extend beyond personal wireless service providers to others, including entities like Intermax, which construct cellphone towers. *See, e.g., Crown*, 2018 WL 3777492, at *4 ("There is no hint in the statute's language that the 'person adversely affected' by the local government's final action also be a person who has been prohibited from providing personal wireless services. That is no doubt why the case law uniformly holds the opposite."). Because Intermax alleges Defendants' denial of its application precluded construction of a cellphone tower on the Beacon Light property, its alleged interests are within the zone of interests § 332(c)(7)(B) protects. Similarly, Intermax has alleged Defendants' denial proximately caused its injury, i.e., its inability to construct the proposed tower.

Intermax's alleged injury here—Defendants' denial of Intermax's application to build a PWSF at the Beacon Light property—is precisely the type of injury the TCA protects. *See Lexmark*, 572 U.S. at 137 (explaining the plaintiff's alleged injuries were "injuries to precisely the sorts of commercial interests [the statute] protects"). Because Intermax has alleged that Defendants proximately caused its injury and that its interests fall within the zone of interests

---

129 (2014) (applying test despite cause of action broadly extending to "any person" who believes they were damaged).

§ 332(c)(7)(B) protects, Intermax is within the class of plaintiffs whom Congress authorized to sue under § 332(c)(7)(B).

This conclusion is consistent with the statutory language of the TCA, Ninth Circuit precedent, and the precedent in many other courts addressing the claims under the TCA of owners of PWSFs.[2] Despite these authorities, Defendants assert this Court lacks jurisdiction under a 2018 declaratory order issued by the Federal Communications Commission (FCC). (Dkt. 12-1 at p. 5) (citing cases reviewing *In re Restoring Internet Freedom*, 33 F.C.C. Rcd. 311, 2018 WL 305638 (Jan. 4, 2018). Specifically, they argue "Intermax's complaint must be dismissed because the Court lacks subject matter jurisdiction as Intermax's services and facilities do not fall under Title II or Title III of the [TCA]" based on their reading of the 2018 FCC order. (Dkt. 12-1 at p. 4). In support of this argument, Defendants cite *ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022), and *Mozilla Corp. v. Fed. Commc'n Comm'n*, 940 F.3d 1 (D.C. Cir. 2019).

Defendants' reliance on *Mozilla* and *ACA* is misplaced. The D.C. Circuit in *Mozilla* reviewed the FCC's 2018 order in *In re Restoring Internet Freedom*, 33 F.C.C. Rcd. 311, 2018

---

[2] *See, e.g.*, *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1041, 1053 (9th Cir. 2014) (addressing §332 claim brought by owner of cell towers); *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 44 (1st Cir. 2012) (addressing claims under TCA alleged by owner of PWSFs challenging denial of application to build cell tower); *1 Source Towers II LLC v. City of Lakeland*, No. 8:21-cv-1225-SDM-SPF, 2022 WL 19228299, at *1-2 (M.D. Fla. Mar. 17, 2022) (rejecting argument that plaintiff applying for permit to construct cellphone tower to resolve gap in Verizon's coverage area alleged effective prohibition claim and rejecting argument plaintiff lacked standing because it had no legally protectable interest in Verizon's coverage area and had not suffered injury-in-fact); *Crown Castle NG W. LLC v. Town of Hillsborough*, No.18-cv-02473-JSC, 2018 WL 3777492, at *3-4 (N.D. Cal. Aug. 9, 2018) (holding wireless tower owner and operator could bring a claim under the TCA); *Horvath Towers III, LLC v. Zoning Hearing Bd. of Butler Twp.*, 247 F. Supp. 3d 520, 528 (M.D. Pa. 2017) (holding entity building cellphone towers and subletting them to providers of personal wireless communications services may assert claim TCA for denial of permit); *Liberty Towers, LLC v. Zoning Hearing Bd. of Twp. Lower Makefield, Bucks Cnty., Pa.*, 748 F. Supp. 2d 437, 442 (E.D. Pa. 2010) (finding tower developer had standing under the TCA) (collecting cases).

**MEMORANDUM DECISION AND ORDER - 14**

WL 305638, to address the validity of: (1) the FCC's reclassification decision of broadband internet services from "telecommunications services" to "information services"; and (2) the FCC's related directive purporting to preempt state net neutrality laws. *Mozilla*, 940 F.3d at 18. *ACA*, likewise, reviewed the FCC 2018 Order to determine whether it preempted a California statute codifying net neutrality rules. 24 F.4th at 1240. Neither *Mozilla* nor *ACA* address whether an entity--like Intermax which constructs, owns, and manages wireless communications facilities--may allege a cause of action under § 332(c)(7)(B)(v) for the denial of a conditional use permit to construct such a facility. Contrary to Defendants' assertion, neither *ACA* nor *Mozilla* prohibits or restricts such a claim for relief. Accordingly, *ACA* and *Mozilla* are inapposite, and the Court denies Defendants' motion to dismiss for a lack of subject-matter jurisdiction.

**B. Indispensable Party**

Defendants also asserted Intermax's complaint should be dismissed for failure to join an indispensable party. Rule 12(b)(7) permits a party to move to dismiss a complaint for failure to join a party who is indispensable under Rule 19, which "governs compulsory party joinder in federal district courts." *Peabody I*, 400 F.3d at 778. As noted above, when determining whether a dismissal is appropriate under Rule 12(b)(7), the court undertakes "three successive inquiries" under Rule 19, including determining whether a nonparty is necessary; if so, whether its joinder is feasible; and if not, whether its is an indispensable party. *Id.* at 779-80.

Under the first prong, a nonparty is "necessary" if joinder is "'desirable' in the interests of just adjudication." *Id.* (quoting Fed. R. Civ. P. 19 Advisory Committee Note (1966)). "There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a)"; rather, "[t]he determination is heavily influenced by the facts and circumstances of each case." *E.E.O.C. v. Peabody W. Coal Co. ("Peabody II")*, 610 F.3d 1070, 1081 (9th Cir. 2010) (quoting *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986)). A nonparty can

be necessary under either Rule 19(a)(1)(A) or Rule 19(a)(1)(B). Under Rule 19(a)(1)(A), a nonparty is necessary if, in that party's absence, "the court cannot accord complete relief among existing parties." Under Rule 19(a)(1)(B), a nonparty is necessary if that party "claims a legally protected interest in the subject of the suit such that a decision in its absence will (1) impair or impede its ability to protect that interest; or (2) expose [another party] to the risk of multiple or inconsistent obligations by reason of that interest." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002).

In this case, Defendants argue "Intermax can only obtain the relief it seeks under Title III of the federal act if Verizon and/or AT&T are joined as a party." (Dkt. 12-1 at p. 9). In support, they assert that "it is Verizon and AT&T that provide personal wireless services"; "those entities invoke the zoning regulations under Title II and III of the [TCA]"; and they "are indispensable . . . because Intermax does not have subject matter jurisdiction on their [sic] own as an information service is categorized under Title I [and] because the entire action hinges on whether the denial of [Intermax's] application for a monopole invokes the regulations of Title II of the [TCA]." (Dkt. 12-1 at pp. 9-10).

Defendants' argument appears to be premised on its assertion that Intermax may not allege a claim under § 332(c)(7)(B) and cannot invoke this Court's federal subject-matter jurisdiction under that provision. Having rejected that assertion, the Court likewise rejects Defendants' assertion that Verizon or some other wireless carrier is an indispensable party to this action. Even absent a wireless carrier, this Court can grant the relief Intermax seeks under § 332(c)(7)(B). Regardless of the outcome of Intermax's claims, that result will not expose Verizon (or another wireless carrier) to the risk of an inconsistent obligation or impair Verizon's ability to protect its interests. Moreover, Defendants do not argue to the contrary. Accordingly, the Court denies

Defendants' Rule 12(b)(7) motion to dismiss Intermax's complaint for failure to join an indispensable party.

## C. Failure to State a Claim

Finally, Defendants move under Rule 12(b)(6) to dismiss Intermax's complaint for failure to state a claim. Defendants argue "Intermax cannot assert any legal rights" for "Verizon or AT&T" and because Intermax "cannot avail themselves [sic] of the Title II and Title III regulations in federal court, they [sic] cannot proceed on the issue of whether the County correctly applied its own code." (Dkt. 12-1 at pp. 11-12). Again, Defendants' argument appears to be premised on its inaccurate assertion that Intermax may not assert a claim for relief under § 332(c)(7)(B). As discussed above, however, Intermax can assert such claims. Further, it has adequately alleged claims for relief under § 332(c)(7)(B).

Intermax alleges Defendants' denial of its application prohibits or has the effect of prohibiting "the provision of personal wireless services" in violation of § 332(c)(7)(B)(i)(ii). Intermax alleges *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure* Investment, 33 F.C.C. Rcd. 90888, 2018 WL 4678555 (F.C.C. Sept. 26, 2018), *aff'd in part*, *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), governs Intermax's claims. (Dkt. 1 at ¶ 74). In support of its effective prohibition claim, Intermax alleges, for example, that there is "a significant gap in personal wireless services in the area surrounding the site" of the proposed facility; "Intermax undertook a good faith and thorough investigation of potential alternative sites" and concluded "no less intrusive sites in the search area are feasible or practically available"; and the denial of its application for a permit to construct the proposed facility "materially inhibits or limits" the provision of wireless services. (*Id.* at ¶¶ 77, 79, 82). Intermax's allegations are adequate to state a claim for relief under § 332(c)(7)(B)(i)(II).

Likewise, Intermax's allegations are adequate to state a claim for relief under § 332(c)(7)(B)(iii), which requires that substantial evidence supports Defendants' denial of Intermax's application. Intermax alleges, for example, that it presented "comprehensive and uncontroverted evidence" in support of its application, which satisfied all the criteria in the Ada County Code; the opponents of its application "did not submit supported evidence contradicting [Intermax's] evidence"; no evidence demonstrated the proposed facility violated FCC regulations regarding emissions; and the denial "ignores [Intermax's evidence] and provides no explanation for its findings and conclusions." (Dkt. 1 at ¶¶ 92-97). Based on these allegations, the Court finds Intermax has not failed to allege a claim for relief.

Defendants' reliance on *ExteNet Systems, Inc. v. City of Cambridge, Massachusetts*, 481 F. Supp. 3d. 41 (D. Mass. 2020), does not persuade the Court otherwise. In that case, ExteNet alleged it was a "'wholesale, facilities-based telecommunications' provider" which provided "fiber optic cables and support equipment network" to wireless service providers, like Verizon, "to provide wireless coverage." *Id.* at 47. Further, ExteNet alleged defendants violated the TCA by denying its "applications to install small wireless facilities." *Id.* at 47.

Like Defendants in this case, the defendants in *ExteNet* moved to dismiss ExteNet's complaint, arguing ExteNet "lack[ed] standing to challenge the denial of its application as an effective prohibition because it does not provide personal wireless services, but instead contracts with companies that provide such services." *Id.* at 52. The court rejected the defendants' argument "because ExteNet is a corporation that was adversely affected" by the defendants' denial of its application. *Id.* at 52. The court, however, dismissed ExteNet's effective prohibition claim under § 332(c)(7)(B)(i)(II) because ExteNet had the burden to establish an effective prohibition but failed to allege any facts establishing "a significant coverage gap." *ExteNet Systems, Inc.*, 481 F. Supp.

**MEMORANDUM DECISION AND ORDER - 18**

3d at 54.  Unlike *ExteNet*, Intermax has repeatedly alleged in this case a significant coverage gap.  (*See, e.g.*, Dkt. 1 at ¶¶ 14-15, 17-19, 21-22, 43, 50, 52).  Accordingly, *ExteNet* is distinguishable and does not support Defendants' assertion that Intermax has failed to state a claim for relief.

### D.  Attorney Fees

Finally, Defendants argue Intermax is not entitled to attorney fees under the TCA. In *City of Rancho Palos Verdes*, the Supreme Court held that Congress, in establishing the TCA's statutory scheme, "intended its judicial remedy as an exclusive remedy," foreclosing plaintiffs' ability to receive attorney fees.  544 U.S. at 128-29 (2005) (Breyer J., O'Connor J., Souter J., and Ginsburg J., concurring).  Intermax acknowledges *City of Rancho Palos Verdes* foreclosed any claim for attorney fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, but it maintains it does not seek fees under these statutes.  Instead, Intermax merely included attorney fees, among other costs, in its general prayer for relief, without citing to a specific statute.  It argues that *Rancho Palos Verdes* does not "preclude the Court from ordering a local government to pay attorneys' fees as a sanction in response to a bad faith pleading, or other similar situations." (Dkt. 14 at p. 20).

As a general matter, it appears both Intermax and Defendants are correct in their positions.  The Court cannot award attorney fees under the TCA, but it is theoretically possible another basis may exist for awarding fees.  The Court declines to address at this juncture whether Intermax would be entitled to an award of attorney fees in this case.

### ORDER

IT IS ORDERED that Defendants' Motion to Dismiss Complaint for Declaratory and Injunctive Relief (Dkt 12) is DENIED.

DATED: January 11, 2024

Amanda K. Brailsford
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 19**