UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| INTERMAX TOWERS, LLC, | Case No. 1:23-cv-00127-AKB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| ADA COUNTY, IDAHO; BOARD OF ADA COUNTY COMMISSIONERS; and TOM DAYLEY, ROD BECK, and RYAN DAVIDSON, each in his official capacity as Commissioner on the Board of Ada County Commissioners, | |
| Defendants. | |

## I.  INTRODUCTION

Plaintiff Intermax Towers, LLC ("Intermax"), brought this action against Defendants Ada County (the "County"); the Board of Ada County Commissioners (the "Board"); and Ada County Commissioners Tom Dayley, Rod Beck, and Ryan Davidson, in their official capacities. Intermax challenges the County's denial of Intermax's application for a conditional use permit (CUP) to construct a 100-foot monopole wireless tower ("proposed tower"). Intermax alleges the denial is not supported by substantial evidence and violates the Telecommunications Act of 1996 (the "TCA"). The parties have filed cross-motions for summary judgment. (Dkts. 30, 35).

Based on the administrative record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho

Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). The Court concludes substantial evidence does not support the County's denial of Intermax's CUP application. Accordingly, the Court orders the County to promptly approve Intermax's application and issue all permits required for the proposed tower's construction and operation.

## II.  BACKGROUND

Intermax constructs, owns, and manages tower assets and wireless infrastructure, which it leases to national and regional wireless carriers, including Verizon, AT&T, and T-Mobile, to provide wireless services to consumers in Idaho and throughout the western United States. Intermax seeks to build and operate the proposed tower—a wireless communications facility in the form of a 100-foot monopole tower—for use by national wireless providers, including Verizon, to provide personal wireless services. (Dkt. 34 at pp. 15, 20-22).

### A.    Verizon's Gaps in Coverage and Capacity

Wireless providers, like Verizon, seek to provide reliable and competitive wireless services. To accomplish this goal, they design and build their wireless networks to ensure customers receive continuous, uninterrupted outdoor, in-vehicle, and in-building coverage.[1] A stronger radio frequency ("RF") signal is required for in-building service, as compared to in-vehicle or outdoor service. (Dkt. 34-10 at pp. 7-11). Consumers rely on their ability to use their wireless phones and connected devices in their homes. (Dkt. 34 at p. 26). Thus, wireless carriers must be able to provide reliable in-building service to avoid a service coverage gap. (Dkt. 34-10 at p. 17). As explained by the County's RF engineering consultant, Ron Valdez, because "most

---

[1]      In-building coverage refers to wireless service with a strong enough signal to work inside a building.

calls are made from a mobile phone and busy hour (high usage) traffic is often in-building, it is *imperative* that all citizens have adequate in-building signal strength to ensure connectivity when needed." (*Id.*) (emphasis added). Reliable in-building service is necessary not only for convenience but also for safety reasons, such as calling emergency services. (*Id.*).

Consistent with their goal of building and improving their networks, wireless providers rely on RF engineers, using advanced RF propagation modeling, field testing, and drive testing, to determine whether and where significant service gaps exist based on lack of signal coverage, lack of network capacity, or both. (Dkt. 34-10 at p. 8). These tools enable RF engineers to accurately identify the need for wireless facilities and to plan the location and height of those facilities to remedy any identified service gaps. Wireless networks have a finite capacity to serve users simultaneously, and that capacity is strained by heavy use, such as when many connected devices are operating at the same time. (*Id.* at p. 9). Accordingly, population growth is a key factor driving both wireless facility placement and the need for additional facilities to maintain adequate network capacity. (*Id.* at pp. 8-9).

### 1.     Current Verizon Service in the Area

Intermax seeks to build its proposed tower at 5410 West Beacon Light Road in Ada County, Idaho (the "Beacon Light site"). The population in that area is rapidly densifying as bare land develops into single- and multi-family homes. (Dkt 34 at p. 20; Dkt. 34-10 at p. 9; Dkt. 34-18 at p. 2). An existing Verizon wireless facility on a dilapidated grain silo (the "silo site") is located approximately 0.7 miles west of the proposed Beacon Light site and currently provides Verizon wireless coverage around West Beacon Light Road, North Palmer Lane, and North Linder Road. (Dkt. 34 at p. 59). Intermax contends, however, that significant service gaps in Verizon's in-building coverage exist in the area, even with Verizon's antennas on the silo site, because of the

low height of that site and because "[r]ecent residential growth in the area has strained wireless infrastructure." (Dkt. 34 at p. 25).

### 2.    Removal of the Silo Site

The loss of the silo site in the foreseeable future will compound the strain on Verizon's wireless network in the area. The lease authorizing Verizon to operate its antennas on the silo site has expired, and Verizon's antennas only remain at the silo site on a month-to-month basis, which may be terminated at any time with only thirty days' notice. (Dkt. 34 at p. 20; Dkt. 34-24 at p. 68). Further, the City of Eagle, which prohibits wireless facilities in residentially zoned areas, has annexed the silo site into city limits. (*Id.* at pp. 4, 11). The City has approved a residential development on the property on which the silo site is located. (*Id.* at p. 4). The approved preliminary plat, however, does not include a location for the replacement wireless service facility; rather, the silo site must be decommissioned and removed before the development begins, which will require Verizon to remove its antennas. (*Id.*).

According to Intermax, removal of the silo site will result in a further significant service gap in Verizon's coverage unless another wireless facility is constructed to provide coverage and signal strength in the area. (Dkt. 34 at pp. 20, 59-63; Dkt. 34-1 at pp. 69-88; Dkt. 34-9 at pp. 19-24, 34). The only other existing Verizon wireless facility near the Beacon Light site is located at Eagle High School (Eagle High School site), which is approximately 1.7 miles from the Beacon Light site. (Dkt. 34 at p. 25; Dkt. 34-24 at p. 12). Intermax maintains that once the existing silo site is removed, the proposed tower at the Beacon Light site will be necessary to maintain reliable wireless coverage and strength of signal in the area, particularly for indoor uses. (Dkt. 34 at p. 25). In other words, the removal of the silo site will result in a significant adverse impact on both

Verizon's service *coverage*, particularly its in-building coverage, and its service *capacity*, which will only worsen as the population increases in the area.

Additionally, Intermax's RF engineering consultant, Steven Kennedy, has opined that the existing coverage of the other two major wireless carriers providing coverage in the area, AT&T and T-Mobile, is inadequate. (Dkt. 34-24 at pp. 12, 69-70, p. 121; *see also* Dkt. 34-13 at pp. 52-53 (T-Mobile) and 54-55 (AT&T)). The County's RF engineering consultant, Mr. Valdez, likewise confirmed this gap in AT&T's and T-Mobile's current coverage. (Dkt. 34-18 at p. 2).

## B.    Intermax's Search for a Suitable Site

To remedy the anticipated service coverage gap resulting from the silo site's eventual removal and the otherwise existing strain on in-building coverage, Intermax undertook a search for a suitable location to construct a tower to replace the silo site. It searched properties near the silo site within a "search ring" – an area on a map showing where a proposed tower should be constructed to best achieve the specific service objectives. (Dkt. 34-9 at p. 35).

Intermax evaluated various potential sites for the proposed tower within the search ring. Further, it evaluated other required characteristics for a feasible site, including whether the location is zoned to allow for a wireless communication facility (as a matter of right or with a conditional use permit); whether the location complies with the Ada County Code's dimensional standards (e.g., property line setbacks); whether the location has legal access; whether the location meets all practical needs (such as nearby utilities and buildable grade); and whether the location is owned by a landowner who is willing to lease a 50-foot by 50-foot portion of the property to Intermax for the proposed tower. (Dkt. 34-9 at p. 35).

After evaluating all these technical and practical needs—as well as the topography, available infrastructure, and size of the surrounding parcels of land—Intermax identified fourteen

properties that could serve as potentially feasible sites for the proposed tower. Only one of the fourteen property owners, however, was willing to lease Intermax a 50-foot by 50-foot area of their property. (Dkt. 34-9 at p. 36; Dkt. 34-24 at p. 273). Because Intermax determined the Beacon Light site was the only viable site for the proposed tower, it signed a lease with the property owner and sought the necessary permits from the County to begin construction. (Dkt. 34 at pp. 45-53).

## C.    Intermax's CUP Application

On October 25, 2021, Intermax filed its CUP application to construct the proposed tower and to operate a wireless communication facility on the Beacon Light site. (Dkt. 34 at pp. 14-77). In its application, Intermax proposed to build a 100-foot monopole tower and related ground equipment, which it contends will enable Verizon to remedy the significant service gap in its coverage once the silo site is removed. (*Id.*). As proposed, Intermax designed the tower to accommodate four carriers' antennas. The proposed tower's anchor tenants are Verizon and Intermax Networks, which provides wireless internet access. (Dkt. 34-1 at pp. 73-87). Also, AT&T and T-Mobile have provided letters of intent to co-locate on the proposed tower. (Dkt. 34-13 at pp. 107-08).

The Ada County Code requires applicants seeking to build a wireless facility to submit "[p]ropagation charts showing existing and proposed transmission coverage at the subject site and within an area large enough to provide an understanding of why the facility needs to be placed at the chosen location." Ada County Code § 8-5-3-114.D.1.b. To comply with this requirement, Intermax submitted RF propagation maps showing: (1) Verizon's existing service coverage around the Beacon Light site; (2) its projected coverage with the silo site's removal; and (3) the proposed towner's projected service coverage without the silo site. (Dkt. 34 at pp. 59-63). After reviewing Intermax's CUP application, the Ada County Development Services' staff ("Staff") concluded the

application complied with all the Ada County Code's requirements and standards and recommended that the Ada County Planning & Zoning Commission ("P&Z Commission") approve the application. (Dkt. 34 at p. 137).

**D.    The County's Public Hearing Process**

The County's review of Intermax's CUP application for the proposed tower included five public hearings and two meetings. On October 25, 2021, the County received the application. (Dkt. 34 at p. 14). As discussed in more detail below, the P&Z Commission initially approved the application, but then opponents of the application appealed that approval to the Board. (Dkt. 34-23 at p. 86). After hearing the appeal, the Board remanded the application to the P&Z Commission. (*Id.*). On remand, the P&Z Commission "recommended approval" of the appeal, which effectively denied the application. (*Id.*). The Board then upheld the P&Z Commission's approval of the appeal thereby denying the application. (*Id.* at p. 87). Intermax moved for reconsideration, but on February 23, 2023, the Board denied the motion and issued its final decision. (*Id.* at p. 88).

**1.    The Commission's Public Hearing and Approval**

On March 10, 2022, Intermax presented its CUP application to the Commission. During Intermax's presentation, Intermax's RF engineering consultant, Mr. Kennedy, presented technical and scientific data, including the RF propagation maps showing Verizon's wireless coverage gap after the silo site's removal, as well as the gap affecting Verizon's in-building coverage around West Beacon Light Road, North Palmer Lane, and North Linder Road. (Dkt. 34-1 at p. 75). Mr. Kennedy testified that Intermax's objectives for the proposed tower include both (a) providing new coverage for Intermax Networks, and (b) enabling Verizon to fill the significant coverage gap resulting from the silo site's impending removal. (*Id.* at p. 69). Mr. Kennedy further noted the population growth in the area will result in wireless capacity problems. (*Id.* at p. 76).

In addition to the technical data, Intermax also presented other evidence, including photo simulations depicting the proposed tower on the Beacon Light site. (*Id.* at p. 100; Dkt. 34-2 at pp. 1-3). Although the area around the site is relatively flat with clear views in all directions, the site is adjacent to a line of 76-foot-tall utility poles. The photo simulations show the tower compared to these poles and indicate the tower would largely blend with those poles. (*Id.*).

Further, Intermax presented data from property value studies which examined the effect of wireless facilities on home values. Studies conducted in 2018 in four U.S. cities concluded there is "negligible to no effect on home sale values within the quarter-mile radius 'sphere of influence' of cell towers." (Dkt. 34-9 at pp. 39-40; Dkt. 34-24 at pp. 7-8). Another study concluded that in at least one market, "the value of properties near a cell tower increased" "in four of the five sub-areas." (Dkt. 34-9 at p. 40). Intermax also presented information from the Ada County assessor explaining that "while it becomes very emotional for owners when [a cell tower is] installed, the overall effect in the market is very minimal. In fact, we have not been able to find any measurable adjustment in the market." (*Id.* at p. 39).

Intermax also rebutted market studies, which opponents of the proposed tower presented showing a drop in property values. Intermax argued that those studies—which are between eighteen and thirty-seven years old—are too old to be relevant and that a 2012 Department of Housing and Urban Development study focusing on homes within the "fall" area of a tower is inapplicable in this case. (Dkt. 34-24 at p. 7). Intermax also asserted that real estate brokers' letters, which its opponents submitted, were not appraisals and violated the Idaho Real Estate Appraisers Act. (*Id.*). Lastly, Intermax challenged a 2019 appraisal which found that a cell tower's installation near a property would decrease that property's value by 10 percent by showing a property value increase of 60 percent after the tower's installation. (*Id.*).

During the P&Z Commission's hearing, several individuals testified in opposition to Intermax's CUP application. These opponents asserted that Intermax failed to present any technical data showing Verizon's coverage in the area; Intermax did not present any information showing the proposed tower would be a benefit to the community; and Verizon's lease at the silo site "is for 50 years" and grants Verizon the right to remain at the silo site. Intermax's opponents also expressed generalized aesthetic and health and safety concerns, including that the proposed tower would have "adverse impacts" on the surrounding properties and community. (Dkt. 34-24 at pp. 14-18). They did not, however, introduce any specific evidence to support their assertions. (*Id.*). After the hearing, the P& Z Commission voted to approve Intermax's application. (Dkt. 34-2 at pp. 10-19).

  2.  **Appeal**

After the P&Z Commission voted to approve Intermax's CUP application, opponents of the application ("appellants") appealed the decision to the Board. (Dkt. 34-2 at pp. 29-37). This appeal resulted in hearings before the Board in July 2022 and September 2022 and another hearing on remand before the P&Z Commission in November 2022.

  a.  **The Board's July 2022 Public Hearing**

On July 13, 2022, the Staff provided the Board with a report concluding Intermax's CUP application complied with the Ada County Code and recommending the Board deny the appeal and uphold the P&Z Commission's decision to approve the application. (Dkt. 34-5 at p. 41). On that same day, the Board held a hearing on the appeal. (Dkt. 34-5 at p. 36). At that hearing, Brad Bentley, presenting on appellants' behalf, provided generalized testimony opposing the proposed tower and restated the appellants' preference for other technologies. (Dkt. 34-24 at pp. 62-65).

Additionally, Mr. Bentley offered an Excel spreadsheet containing the results of his own collection of signal strength information from a single point at the Beacon Light site. (*Id.* at pp. 62-63).

Mr. Bentley, however, did not provide an explanation of his methodology for obtaining his signal strength measure or any proof that measure accurately captured the existing state of Verizon's wireless network. Nor did Mr. Bentley address Verizon's coverage gap after the silo site's removal. Mr. Bentley also asserted, without any supporting evidence, that alternative technologies (like in-home wifi) eliminated the need for wireless carriers to provide in-building cell service and that he wanted in-home internet via fiber optics, not wireless service. (*Id.*). Finally, in his rebuttal, Mr. Bentley testified that he recently moved from California to Idaho "to live [his] values more freely" and "to leave those things [cell towers] behind." (*Id.* at p. 76).

Other opponents who testified against the proposed tower included four officers of an anti-wireless organization, Idahoans for Safe Technology, which has the goal of prohibiting new wireless infrastructure. (*Id.* at pp. 71-73; 75). None of these individuals disclosed at the hearing that they are leaders of this anti-wireless organization, and none of them live near the Beacon Light site. (Dkt. 34-9 at p. 51). One individual, who lives a mile and a half from the Beacon Light site, opposed the proposed tower and testified the "last cell tower that was installed put [him] into aFib." (Dkt. 34-24 at pp. 73-74).

Another individual, who lives near the Beacon Light site and owns an organic "hobby" farm, also testified. She presented a simulated photo of what the proposed tower would look like from her front porch. Further, she testified that her organic farm caters to "health-oriented individuals," who "unplug their wireless modems at the end of the night so that they're not affected," and that she believes the installation of the proposed tower would "absolutely crush[]" her business. (*Id.* at pp. 74-75).

**MEMORANDUM DECISION AND ORDER - 10**

In response, Intermax's RF engineering consultant, Mr. Kennedy, testified again about: (a) Verizon's current wireless coverage in the area; (b) the existing coverage with the silo site; (c) how the silo site's removal will result in a coverage gap; and (d) how the proposed tower would remedy that gap. (Dkt. 34-24 at pp. 68-70). In addition to presenting the RF propagation maps submitted with the original application, Mr. Kennedy presented the results of a "drive test."[2] (Dkt. 34-9 at p. 25; Dkt. 34-24 at p. 69). According to Mr. Kennedy, the drive test revealed that Verizon's signal strength—even with the silo site—was not sufficiently strong for in-building coverage in some areas but overall Verizon coverage was "pretty good" with the silo site. (Dkt. 34-24 at pp. 68, 70). Mr. Kennedy reiterated, however, that the silo site's removal will result in a significant coverage gap in Verizon's service. (*Id.* at pp. 68, 70).

Mr. Kennedy also tested T-Mobile's signal strength in the area, and this drive test revealed that T-Mobile's signal strength failed to meet the in-building threshold and was "poor" in all locations. (Dkt. 34-9 at pp. 28-31). Further, Mr. Kennedy testified that he had worked with a Verizon RF engineer to add a third sector to Verizon's planned antenna array on the proposed tower and to fine-tune Verizon's antenna design and installation. (*Id.* at p. 68).

Despite the Staff's conclusion that Intermax's CUP application complied with the Ada County Code and the recommendation that the Board deny the appeal, the Board tabled the appeal at the hearing's conclusion to, among other things, allow the Staff to "hire an unbiased telecommunications expert to assist the Board in analyzing data" (Dkt. 34-9 at p. 54); to require Intermax to conduct "further research and provide information about a proposed cell tower on nearby property which the Bureau of Land Management ("BLM") manages; and to require the

---

[2]    A "drive test" involves the RF engineer driving the area while advanced equipment collects thousands of real-time data points regarding the signal strength being encountered by the equipment on the car.

MEMORANDUM DECISION AND ORDER - 11

appellants to provide "proof of diminished land values in the surrounding area resulting from the proposed cell tower." (*Id.* at p. 62).

### b.    The Board's September 2022 Continued Public Hearing on Appeal

Following the Board's July 2022 hearing, the County hired Mr. Valdez, an RF engineering consultant, as its "unbiased telecommunications expert to assist the Board in analyzing data" (Dkt. 34-8 at p. 54) and "to review the application materials submitted for the project to verify it will resolve a gap in coverage, as required by Ada County Code." (*Id.* at p. 62). Meanwhile, Intermax submitted supplemental information describing its consideration of BLM property and explaining a wireless facility on those properties would not enable Verizon to resolve its significant coverage gap in service. (Dkt. 34-9 at pp. 1028-1038; Dkt. 34-13 at pp. 1511-1517).

At the continued hearing on the appeal in September 2022, Mr. Valdez presented his report. (Dkt. 34-10 at pp. 4-14; Dkt. 34-24 at p. 115-119). Further, Intermax presented updated drive test results, including measurements taken while the silo site was turned off. (Dkt. 34-13 at pp. 48; Dkt. 34-24 at pp. 120-121). These drive test results confirmed Verizon's coverage in the area would be poor without the silo site. (*Id.*). Intermax also presented updated drive test results for T-Mobile and AT&T, which also showed their coverage in the area was poor. (Dkt. 34-13 at pp. 52-53, 122; Dkt. 34-24 at pp. 120-121). Further, Intermax presented additional propagation maps and computer modeling showing the BLM property was not suitable to remedy the coverage gap. (Dkt. 34-24 at p. 119)

Mr. Bentley also testified again at the September 2022 hearing on appellants' behalf. He noted the owner of the organic hobby farm near the Beacon Light site conducted a survey of her 300 customers with a 30 percent response rate. According to Bentley, "over 90 percent" who responded to the survey stated "they would consider an alternative farming option" in lieu of "an

organic farm underneath [the] proposed cell tower." (Dkt. 34-24 at p. 123). At the hearing's conclusion, the Board remanded Intermax's CUP application to the P&Z Commission for Mr. Valdez to report on Intermax's CUP application. (Dkt. 34-24 at p. 126).

####     c.     The Commission's November 2022 Public Hearing on Remand

On November 17, 2022, the P&Z Commission held a public hearing on remand. The opponents of Intermax's CUP application reiterated their same objections to the proposed tower, including their concerns about a purported lack of proof of a coverage gap, the health impacts of RF emissions, the harms of cell towers in general, and how people moved to the area to get away from cell towers. (Dkt. 34-24 at pp. 167-72). Five individuals, including Mr. Bentley, testified in opposition to the application. Like Mr. Bentley, three other individuals had previously testified in opposition to the application; the fourth individual was a man who lives in Sausalito, California. None of those who testified in opposition to the application live near the proposed site, except the hobby farm owner.

Mr. Valdez also presented his second report at the remand hearing. (Dkt. 34-13 at p. 109-116; Dkt. 34-24 at pp. 152-154). In this report, Mr. Valdez acknowledged Intermax's drive test when the silo site was turned off resulted in a "10x" drop in usable signal strength for Verizon. (Dkt. 34-13 at p. 111). Further, Mr. Valdez testified the proposed facility is "definitely" needed, stating that "the bottom line is . . . if you lose that silo site, which you will, you're going to need another site within that same area, there's absolutely no doubt, from Verizon, AT&T and T-Mobile." (Dkt. 34-24 at p. 173).

At the conclusion of the remand hearing, the P&Z Commission recommended the Board deny Intermax's CUP application. (Dkt. 34-24 at pp. 182-188). Some of the reasons given for denying the application included the adverse impact on property values, including the nearby

organic farm; Intermax's failure to adequately assess the BLM property as an alternative site; and the visual intrusion of the proposed tower for those driving by it. (*Id.* at pp. 184, 185).

### d.    January 2023 Hearing Before the Board

On January 4, 2023, the Board continued its public hearing on the appellants' appeal. (Dkt. 34-17 at p. 97). During this hearing, the County's RF engineering consultant, Mr. Valdez, presented his third report, including his evaluation of Intermax's comprehensive supplemental data. (Dkt. 34-17 at pp. 99-100; Dkt. 34-18 at pp. 1-2). Mr. Valdez reached the following conclusions:

- "The Applicant provided the information needed to show the coverage hole created by losing the Silo site and not building the Beacon Light Road site." (Dkt. 34-18 at p. 1).

- "The Applicant's [RF] maps have been proven to show a realistic view of expected coverage." (*Id.*).

- "The BLM site[] locations are not optimal for providing 4G and 5G service to existing service areas." (*Id.* at p. 2).

- "[T]he Applicant did a good job limiting the height of the tower and provided a solution that ensures that all carriers can benefit from this build in a single location." (*Id.*)

- "The carriers would provide even better service to the local area if the tower was taller, but . . . the Applicant is doing all [it] can to compromise with the local community." (*Id.*).

Mr. Valdez concluded he did not "see any other viable option other than Beacon Light [site]" (*Id.*), and he opined that "the Beacon Light Tower is the best option for the community as a whole." (*Id.* at p. 3).

During Mr. Valdez's January 2023 presentation he testified that "as we went through this process[,] the applicant did a comprehensive drive test, did their due diligence on looking at other locations, and provided information show[ing] the models that they generated, the heat maps that

they generated are accurate number one. And number two, they provided empirical data of the impact of the coverage." (Dkt. 34-24 at p. 265). Additionally, he testified that the Beacon Light site "is the best available location [where] you can build a multi-carrier tower that serves not just the people [who] live close to that area but the entire community—all those who travel, all those who live on the cell edge, all future residents [who] are going to move in. This is very critical. Infrastructure is absolutely critical." (*Id.*). Finally, Mr. Valdez concluded, "So my final position was that I do believe the applicant provided enough data. I feel like this is a great location given all things. I think that it's good for the future. I think that it provides just the best opportunity for the entire community." (*Id.* at p. 265). "So you know, my position is is [sic] the applicant has done more than enough to show the need. I think they've done an excellent job compromising . . . . And I feel very strongly that this is a great location and a great opportunity." (*Id.*).

Mr. Valdez's third report to the Board also rejected the assertions and comments submitted by opponents of Intermax's CUP application, including:

> The Appellant has tried to use factors such as health risk, property values, and loss of business revenue to justify the need to eliminate the Beacon Light site as a viable candidate. All of these items are subjective and there has been no factual data presented by the Appellant to justify any of these claims. . . . Some of the Appellant statements concerning possible health and financial impacts were made by people that own high value properties far away from the Beacon Light site. This should raise some questions about why they are part of the appeal process and why their input is relevant. . . . In addition to the generalized arguments about the negative impacts of cell towers, the Appellant attempted to provide their own technical justification by third party sources, which has proven to be inaccurate and shows the lack of industry experience for valid technical input.

(Dkt. 34-17 at p. 100). Notwithstanding Mr. Valdez's opinions and the Staff's recommendation to approve Intermax's CUP application, the Board voted 2-0 (with one abstaining) at the conclusion of the January 2023 hearing to uphold the P&Z Commission's decision on appeal and to deny Intermax's CUP application. (Dkt. 34-23 at pp. 43-44).

MEMORANDUM DECISION AND ORDER - 15

### 3.    Intermax's Request for Reconsideration

On January 17, 2023, the Board issued its written Findings of Fact, Conclusions of Law, and Order formally denying Intermax's CUP application. (Dkt. 34-23 at p. 55). Intermax timely filed a request for reconsideration of the Board's denial. (*Id.* at pp. 75-77). On February 28, 2023, the Board denied Intermax's request for reconsideration. (*Id.* at pp. 86-88). Having exhausted its administrative remedies, Intermax filed this action seeking declaratory and injunctive relief. In its complaint, Intermax alleges that the County's determination was: (1) an unlawful prohibition of service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); and (2) not based on substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii). Both parties move for summary judgment. (Dkts. 30, 35).

## III. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). At the summary judgment stage, the trial court must view the evidence in the light most favorable to the nonmoving party. If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo*

*ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Where parties file cross-motions for summary judgment on the same issue, the court must consider both motions and all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Each motion must be considered on its own merits. *Id.* Even if both parties assert no genuine disputes of material fact exist, the court must still review the record and determine whether disputes of material fact exist. *Id.*

## IV. ANALYSIS

### A.    The Telecommunications Act

Congress passed the TCA to facilitate the development of a national wireless communications system, unhampered by an inconsistent patchwork of state and local wireless regulations. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127-28 (2005) (Breyer, J., concurring). The TCA aims to develop wireless infrastructure by removing local regulatory barriers while also recognizing state and local governments have a legitimate interest in regulating the siting of wireless facilities. *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 407 (3d Cir. 1999). To balance these competing interests, the TCA attempts to preserve local government's traditional zoning authority to regulate the placement of wireless communication facilities like cell phone towers "but imposes specific limitations on that authority." *T-Mobile S., LLC v. City of Roswell, Ga.*, 574 U.S. 293, 300 (2015); *City of Rancho Palos Verdes*, 544 U.S. at 115.

This case implicates two of those limitations on the County's authority to regulate the siting of Intermax's proposed facility. First, the County's denial of Intermax's CUP application must be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Second, the County's denial of the permit must not "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Because the Court finds substantial evidence does not support the Board's decision, the Court does not address whether the Board's decision also violates the TCA. *See MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 724 (9th Cir. 2005) ("If a zoning board's decision, reached under its own rules, is not supported by substantial evidence, then we need not consider the application of the anti-prohibition or anti-discrimination prongs of the statute.").

**B.    Substantial Evidence Challenge**

**1.    Standard of Review**

The TCA requires substantial evidence supports the denial of an application for a personal wireless service facility. 47 U.S.C. § 332(c)(7)(B)(iii). The Ninth Circuit has interpreted this language to mean "the traditional standard used for judicial review of agency decisions." *MetroPCS*, 400 F.3d at 723. "Substantial evidence, therefore, means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . As measured by degree, substantial evidence is usually considered to be more than a mere scintilla and less than a preponderance." *Voice Stream PCS I, LLC v. City of Hillsboro*, 301 F. Supp. 2d 1251, 1256 (D. Or. 2004) (citations and quotation marks omitted).

The Court must review the entire record and "must take into account contradictory evidence in the record." *California RSA No. 4 v. Madera Cnty.*, 332 F. Supp. 2d 1291, 1302 (E.D. Cal. 2003). While review under the substantial evidence standard is deferential, it must be more

than a rubber stamp. *Id.* A local board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Id.* at 1303 (citations omitted). Likewise, the substantial evidence standard must be applied using common sense, and the Court "need not accept as substantial evidence impossible, incredible, unfeasible, or implausible testimony." *AT&T Wireless Servs. of California LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148, 1159 (S.D. Cal. 2003).

The substantial evidence review under the TCA does not incorporate federal substantive standards. *MetroPCS*, 400 F.3d at 723. Courts look instead to the requirements in the local zoning ordinance to ascertain the substantive criteria to be applied. *Id.* at 723-24. In other words, a governing body's decision to deny a request to construct a wireless telecommunications facility cannot be based on arbitrary criteria; rather, it must be grounded in procedural and substantive requirements specifically set forth in state and local law. *Id.* In short, the substantial evidence inquiry distills to two questions: "(1) whether the [County's] decision was authorized by local law and, if it was, (2) whether it was supported by a reasonable amount of evidence." *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 721 (9th Cir. 2009). The County is limited to the reasons for denial articulated in the written decision, and it cannot assert new grounds on judicial review. *See, e.g.*, *City of Roswell*, 574 U.S. at 304 n.3 (explaining contrary holding would leave applicant left to guess what locality's written reasons will be and risk being "sandbagged" by post-hoc rationalizations in subsequent litigation).

### 2.     Substantial Evidence Did Not Support the County's Decision

The reasons the Board articulated for denying Intermax's CUP application can generally be placed into four categories: (1) the failure to demonstrate the proposed tower resolves a significant coverage gap; (2) the failure to demonstrate a need for the proposed tower in the chosen

location; (3) the failure to demonstrate an existing tower at Eagle High School site is unable to provide replacement service and capacity for the silo site and to otherwise meaningfully evaluate alternative locations; and (4) the existence of undue adverse impacts, "particularly as it relates to diminished property values," "business operations," and compatibility with surrounding properties.

### a.    Failure to Demonstrate a Significant Gap in Coverage

In support of its decision overturning the Commission's approval of Intermax's CUP application, the Board found Intermax was unable "to demonstrate the proposed cell tower resolves a significant gap in coverage of the area." (Dkt. 34-23 at p. 55). Challenging this finding, Intermax argues "the Ada County Code does not require a demonstration that the [proposed tower] is necessary to resolve a significant gap." (Dkt. 37 at p. 22). Intermax is correct; the Ada County Code does not require an applicant to show a proposed facility resolves a significant gap in coverage. Rather, that inquiry is a basis for establishing an effective prohibition in violation under the TCA. *MetroPCS*, 400 F.3d at 730-31. In contrast to the effective prohibition analysis under the TCA, the substantial evidence test "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*. *Id.* at 723-24.

By finding Intermax did not purportedly demonstrate the proposed tower resolves a significant coverage gap, the Board "invent[ed] a criterion for which the applicable local ordinances did not provide," namely, that Intermax show the proposed facility resolves a significant coverage gap. *See T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty., Kansas City*, 546 F.3d 1299, 1308 (10th Cir. 2008). Because a decision denying an application must be grounded in procedural and substantive requirements specifically set forth in state and local law, "[g]overning bodies cannot simply arbitrarily invent new criteria in order to reject an application."

*Id.* (quoting *Virginia Metronet, Inc. v. Bd. of Supervisors of James City Cnty., Va.*, 984 F. Supp. 966, 974 n.14 (E.D. Va. 1998)); *see also New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir. 2002) (denial of variance based on criteria not part of relevant city ordinance does not constitute substantial evidence); *City of Carlsbad*, 308 F. Supp. 2d at 1163 (explaining "the city may not arbitrarily impose new CUP criteria not in place at the time of plaintiff's application"); *Group EMF, Inc. v. Coweta Cnty.*, 131 F. Supp. 2d 1335, 1343 (N.D. Ga. 2000) (county's denial of permit to build cell site due to applicant's failure to consider alternative cell sites was not supported by substantial evidence because the local ordinance imposed no such requirement).

The County contends the Board properly considered the federal "significant gap in coverage" standard because Intermax referenced the standards under the TCA for effective prohibition in its application and presentations to the County. (Dkt. 38 at p. 21). The County argues the only reason Intermax now asserts the TCA's effective prohibition standard is inapplicable under the substantial evidence inquiry is "because Intermax realizes that under federal law it cannot meet the prohibition of service requirement." (Dkt. 38 at p. 21).

Contrary to the County's argument, the Ninth Circuit has made clear that the substantial evidence inquiry does not incorporate the TCA's substantive federal standards. *See MetroPCS*, 400 F.3d at 723-24. "Although the TCA does not divest local officials of any authority they may have to consider the quality of existing services, neither does it create such authority. Efforts to assess existing quality must be authorized by and performed within the parameters of governing state and local law." *Wyandotte Cnty*, 546 F.3d at 1308 (quoting *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 70 (3d Cir. 1999)); *MetroPCS*, 400 F.3d at 723-24 (explaining "the substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether

the zoning decision at issue is supported by substantial evidence i*n the context of applicable state and local law*"). "In other words, [the Court] must take applicable state and local regulations as [it] find[s] them and evaluate the [County's] decision's evidentiary support (or lack thereof) relative to those regulations. If the decision fails that test it, of course, is invalid even before the application of the TCA's federal standards." *MetroPCS*, 400 F.3d at 724; *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 992 (9th Cir. 2009).

Simply put, "it is not ultimately for the local zoning board to decide what kind of coverage gap is acceptable or to make the determination whether an 'effective prohibition' exists; that is a matter of federal law, entrusted to the federal courts." *Vertex Tower Assets, LLC v. Town of Canton*, 731 F. Supp. 3d 174, 190 (D. Mass. 2024) ("Such questions about the 'need' for cellular service are plainly governed by federal law, and the TCA preempts local control."); *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38-39 (1st Cir. 2014) ("The question of whether or not a local denial constitutes an effective prohibition violative of the Act is definitively answered by the district court, not the local zoning authority."); *see also City of Anacortes*, 572 F.3d at 995 (recognizing locality may violate the TCA's effective prohibition clause even if substantial evidence supports the locality's decision denying permit). Because the Ada County Code did not require Intermax to show the proposed facility resolves a significant coverage gap, local law did not authorize the Board's decision in this regard, and that decision necessarily fails the substantial evidence test. *MetroPCS*, 400 F.3d at 723-24. Moreover, as discussed below, Intermax has shown the proposed tower would resolve a significant coverage gap.

### b. Failure to Show a "Need" for the Proposed Facility

The Board also found that Intermax's application did not comply with Ada County Code § 8-5-3-114D(1)(b), which provides an applicant must provide "propagation charts showing

existing and proposed transmission coverage at the subject site and within an area large enough to provide an understanding of why the facility needs to be placed at the chosen location." (Dkt. 34-23 at p. 60). The County describes this provision as a "suitability analysis" which is "inextricably linked to gap in coverage," and it argues the Board determined the proposed tower did not need to be located at the Beacon Light site "because there was no significant gap in coverage." (Dkt. 38 at p. 21).

Contrary to the assertion that Intermax did not comply with § 8-5-3-114D(1)(b), a review of the records establishes Intermax provided significant evidence, including propagation charts, demonstrating an "understanding of why the facility needs to be placed at the chosen location." *Id.* For example, in Intermax's initial application, it provided propagation maps showing a significant gap in Verizon's service with the removal of the silo site and how the proposed tower would remedy that gap. Additionally, Intermax presented evidence explaining why it believed the proposed site was the only viable location to remedy that gap.

Later during the P&Z Commission's March 2022 hearing, Intermax's RF engineer, Mr. Kennedy, presented technical and scientific data, including the propagation maps and computer modeling, and testified Verizon would experience a significant gap in in-building coverage with the silo site's removal. Mr. Kennedy also noted that the population in the area is increasing with more houses being built, which will result in wireless capacity problems.

Further, Intermax provided additional evidence on appeal, including numerous drive tests showing Verizon's signal strength when the silo site was off and drive tests showing both T-Mobile and AT&T's poor signal strength. All these drive tests shows Verizon, T-Mobile, and AT&T have significant gaps in their in-building coverage. Intermax also conducted research regarding possible BLM locations and provided information showing these sites were not optimal.

Indeed, the County's own RF expert, Mr. Valdez, provided three separate reports and ultimately concluded that Intermax had "provided the information needed to show the coverage hole created by losing the Silo site and not building the Beacon Light Road site" and opined that the proposed facility was "the best option for the community as a whole." (Dkt. 34-18 at p. 1, 3). Mr. Valdez unequivocally testified that he did not "see any other viable option other than Beacon Light [site]." (*Id.* at p. 3).

In contrast, there is virtually no evidence disputing Mr. Valdez's opinion and Intermax's information. Although Mr. Bentley, who opposed Intermax's CUP application, presented an Excel spreadsheet representing "actual drive data" for "all three carriers at the exact site of the [proposed] tower" and showing "a great signal at this location across all three carriers" (Dkt. 34-24 at p. 63), nothing in the record indicates what methodology Mr. Bentley followed or whether he had the requisite expertise or was otherwise qualified to opine on the coverage gap. Similarly, other opponents, who generally asserted they already have adequate coverage, provided no supporting technical data or other evidence.

None of the information Intermax's opponents presented, either singularly or cumulatively, qualifies as substantial evidence. "When, as here, an applicant has presented an engineering report showing a coverage gap and detailing efforts to minimize intrusion, mere expressions of doubt, without more, cannot amount to substantial evidence." *Canton*, 731 F. Supp. 3d at 191; *see also Madera Cnty.*, 332 F. Supp. 2d at 1306 (rejecting as substantial evidence fears or concerns that were "objectively unreasonable, speculative, and not supported by the record"). Likewise, lay opinions about signal strength and personal observations do not constitute substantial evidence. *Id.* at 1308; *see also T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 804

(6th Cir. 2012) (explaining tower opponent's "ostensibly lay opinion" about wireless provider's coverage in the area was not substantial evidence).

As the Sixth Circuit has emphasized, "[s]ubstantial evidence should be substantiated." *Bloomfield*, 691 F.3d at 800. This substantiation requirement is particularly important, here, because the County's own expert, Mr. Valdez, opines the proposed tower is necessary at the Beacon Light site. *See, e.g.*, *New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trustees*, 812 F. Supp. 2d 143, 157 (E.D.N.Y. 2011) (finding board's permit denial, "which ignored the expert testimony, technical reports, and data," was not based on substantial evidence); *Madera Cnty.*, 332 F. Supp. 2d at 1309 (noting generalized fears, particularly when opposed by expert testimony, do not amount to substantial evidence); *T-Mobile N.E. LLC v. Town of Barnstable*, 2020 WL 3270878, at *6-7 (D. Mass. June 17, 2020) (ruling town cannot ignore its own expert).

Further, the Court is not persuaded by the County's argument there was a "lack of proof indicating the tower would even provide personal wireless services." (Dkt. 35 at p. 29). Contrary to this argument, the record clearly establishes Verizon, at the very least, intends to use the proposed tower to provide commercial wireless services. The County, on the other hand, cites no evidence in the record to suggest Verizon will *not* place its personal wireless facilities on the proposed tower. Additionally, Intermax presented evidence, including signed letters of intent, showing both T-Mobile's and AT&T's interest in co-locating on the proposed tower, and the record contains no evidence to the contrary.[3]

---

[3] The Federal Communications Commission recently held that 47 U.S.C. § 332(c)(7)(B) protects wireless internet access service. *Safeguarding the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket No. 23-320, FCC 24-52 ¶ 76 (Apr. 25, 2024) ("2024 Internet Order") (published in the Federal Register on May 22, 2024. See 89 Fed. Reg. 45404 (May 22, 2024).). This holding further undermines the County's argument that the proposed tower will not provide "personal wireless services" within the meaning of the TCA.

Likewise, the Court is not persuaded by the County's position that it is doubtful the silo site will be decommissioned. The record indicates, without contradiction, that it will be. Indeed, the Board appears to recognize it eventually will be decommissioned. (*See, e.g.*, Dkt. 34-23 at p. 62) (discussing "replacement" service). Moreover, the Board did not base its decision on any doubt that the silo site will be decommission. As a result, the County cannot now rely on this basis to support the denial.

Based on a review of the entire record, the Court concludes substantial evidence does not support the Board's finding that Intermax failed to show why the proposed facility must be located at the Beacon Light site. This finding ignores the objective evidence. For example, it ignores both Mr. Kennedy's and Mr. Valdez's opinions that the Beacon Light site is the only feasible location for the proposed tower. Rather than credit these opinions, the Board improperly credited the unverified, anecdotal statements of lay individuals about their personal experiences and preferences.

<b>c.    Failure to Evaluate Alternative Sites</b>

In support of its denial of Intermax's CUP application, the Board also found that Intermax purportedly failed to demonstrate the existing tower at the Eagle High School site, which is located approximately 1.7 miles from the Beacon Light site, "is unable to provide replacement service and capacity for the existing silo facility." (Dkt. 34-23 at p. 62). Ada County Code places the burden on an applicant to demonstrate a proposed facility cannot be accommodated on an existing site within a two-mile radius due to one of six enumerated reasons. Ada County Code § 8-5-3-114(E)(5) (enumerating reasons).

The County contends this provision "is linked to the intrusive means test" of the Ninth Circuit's two-part test for assessing effective prohibition claims. Further, it asserts Intermax failed

to meaningfully explore other alternatives, including the tower at the Eagle High School site. More specifically, the County complains Intermax never evaluated "whether a taller tower at the Eagle High School location would cover the alleged gap in Verizon services that would occur if the silo site were to be removed." (Dkt. 35 at p. 18). This argument is both legally and factually flawed.

First, as discussed above, the Court must look to the substantive requirements of local regulations in evaluating whether substantial evidence supports the denial of a permit to construct a wireless facility. Although the County claims the Ada County Code incorporates the "intrusive means test," the County fails to cite any provision requiring such a showing. The Code never mentions the "least intrusive means test" nor requires an applicant to "meaningfully explore other alternatives." At most, the Code requires an applicant to evaluate whether an *existing* facility can accommodate the planned antennas at heights sufficient to be "commercially functional." Ada County Code § 8-5-3-114(E)(5)(d). This provision, however, does not require an applicant to evaluate whether an existing structure can be made taller to accommodate the planned equipment, as the County argues. Accordingly, the Code does not support this reasoning for the Board's denial.

Second, as a factual matter, the written record shows Intermax did provide unrefuted evidence that the Beacon Light site—although imperfect—is the only viable site to remedy the existing gap in wireless coverage in the area and that the Eagle High School site would not remedy the coverage gap. Intermax presented voluminous evidence, including drive tests and other standard industry analyses, showing Verizon's existing facility at Eagle High School cannot remedy the coverage gap without the silo site. (Dkt. 34 at pp. 34, 60; Dkt. 34-24 at p. 12).

The County's contrary argument relies on a statement from Intermax's attorney, Joshua Leonard, made at the first hearing before the P&Z Commission. At that hearing, Mr. Leonard— who is not an RF engineer—only said he did not know if making the existing tower taller would

work because it's "still a ways away," and "there's so many factors that go into it." (Dkt. 34-24 at p. 11). Critically, the County ignores the follow-up testimony of Intermax's RF expert, Mr. Kennedy, who stated unequivocally that the Eagle High School site would not provide adequate coverage even with a taller tower. (*Id.* at p. 12). Even if the Board did not believe Mr. Kennedy, substantial evidence must exist in the record to support this disbelief.

The County also argues "the [Board] did not see enough evidence that Intermax made a 'good faith effort' to solicit the location of the proposed tower on federal, state, county or city property within a two (2) mile radius." (Dkt. 35 at p. 25). The Board, however, found precisely the opposite: "The Board finds the applicant has demonstrated a good faith effort has been made to solicit the location of the proposed tower on federal, state, county, or city property when such property exists within the two (2) mile radius." (Dkt. 34-23 at pp. 62-63). Further, Intermax's multiple presentations demonstrating that alternative sites on the BLM-managed property would not remedy the coverage gap contradicts the County's argument that Intermax did not make a good faith effort to evaluate other locations.

The County's expert, Mr. Valdez, agreed a BLM site would not be a viable site. The County, however, now attempts to discount Mr. Valdez's conclusions by claiming that he was "biased" and that his analysis of the BLM property was "not based on data." (Dkt. 35 at 19.) This claim, however, ignores Mr. Valdez's explanation in his third report acknowledging that "the Applicant did provide predictive maps on the BLM locations" (Dkt. 34-18 at p. 1) and that based on those maps, "even if different designs were applied to the BLM location, the probability that these locations would be viable are low. The towers are too far away for Verizon." (*Id.*). Simply because Mr. Valdez, who was the County's retained expert, disagreed with its preferred outcome does not make him "biased."

In summary, Ada County Code contains no requirement that Intermax satisfy the Ninth Circuit's "least intrusive means" test. Nor does it contain a requirement that an applicant evaluate whether modifying an existing tower by making it taller would fill the coverage gap. However, even if the Code did contain such a requirement, the written record contains uncontested evidence that making the tower at the Eagle High School site taller would not remedy the coverage gap. Consequently, substantial evidence does not exist in the written record to support the County's denial on this basis.

### d.    Lack of Compatibility, Undue Adverse Impacts, Impediments

Finally, the Board denied Intermax's application because the proposed tower "will not be architecturally and visually compatible" with the surrounding area (Dkt. 34-23 at p. 59); it "may create undue adverse impacts on surrounding properties, particularly as it relates to diminished property values, and business operations" (*id.* at p. 63); and it may impede the normal development of surrounding property (*id.* at p. 64). Although each of these reasons are grounded in the Ada County Code, substantial evidence does not support them.

Throughout the application and hearing process, Intermax presented evidence showing the proposed tower would be architecturally and visually compatible and would not create undue adverse impacts on the surrounding area. This evidence includes: (1) expert testimony and technical reports showing the proposed facility met all of the Ada County Code's technical provisions and complied with other requirements, including those related to the Federal Aviation Administration, the Idaho Bureau of Aeronautics, and the Federal Communications Commission's standard for RF emissions, construction and setback requirements, and suitability requirements; (2) photographic simulations showing the proposed tower's anticipated appearance from various points of views and distances and in comparison to nearby utility poles; (3) property value studies

showing the proposed tower would not have a negative impact on property values; and (4) information showing multiple carriers are interested in co-locating their facilities on the proposed tower, thereby limiting the number of future towers in the area and mitigating adverse impacts and any impediments to normal development in the area.

In contrast, the contrary evidence consists primarily of "not-in-my-backyard" objections to cell towers in general. For example, at the P&Z Commission's hearing on remand, one resident— who lives near a different tower more than a mile away—testified, "most people move out here in rural Eagle because they don't want to have a big cell tower with all of this—this RF energy in their backyards and in these neighborhoods." (Dkt. 34-24 at p. 168). This resident further stated, "I don't care how much money the Applicant has to spend to go up and deal with BLM and try to find a proper location, *put this up away from people* . . . . And they need to take down the tower in my backyard. . . ." (*Id.*).

Another local resident testified that they "moved to this area for a specific reason, to have land and enjoy a beautiful part of the valley, not have a cell phone tower." (*Id.* at 170). Similarly, Mr. Bentley testified, "this is not why I came to Idaho . . . one of the many reasons I left California was to leave those things [cell towers] behind." (*Id.* at p. 176). Other testifying opponents do not live anywhere near the Beacon Light site (including one from Sausalito, California); regardless, one testified that "you're dispensing heavy industrial equipment poison in the residential areas. You don't want to do that." (Dkt. 34- 24 at p. 172).

Numerous courts, including courts in the Ninth Circuit, have held that generalized and unsubstantiated concerns, even concerns based on aesthetics, do not constitute substantial

evidence. *Madera Cnty*, 332 F. Supp. 2d at 1309 (collecting cases).[4] Yet, as the County's own consultant observed, those opposed to the proposed tower "tried to use factors such as health risk, property values, and loss of business revenue to justify the need to eliminate the Beacon Light site as a viable candidate. All of these items are subjective, and there has been no factual data presented by the Appellant to justify any of these claims." (Dkt. 34-14 at p. 100).

Only one opponent to the proposed tower—the owner of the hobby organic farm— provided evidence in support of her opposition, namely a survey of her customers showing "they would consider an alternative farming option" in lieu of an "organic farm underneath this proposed tower." (Dkt. 34-24 at p. 123; *see also id.* at p. 170). Nothing in the record, however, indicates the Board confirmed the accuracy of this data or ascertained the methodology for collecting it. As a result, substantial evidence does not support the survey's findings. *C.f. City of New Orleans v. S.E.C.*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("We have held that an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology

---

[4]    *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 880 (E.D. Pa. 1998), *aff'd*, 181 F.3d 403 (3d Cir. 1999) ("Generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence."); *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999) (finding "the few generalized expressions of concern with "aesthetics" cannot serve as substantial evidence on which the Town could base the denials"); *Telespectrum v. Public Service Com'n of Kentucky*, 227 F.3d 414, 424 (6th Cir. 2000) (holding denial of an application to erect a 199-foot tower in a heavily wooded rural area devoted to agriculture, more than 1000 feet from four residences in the area and not subject to local zoning or land use requirements, was not supported by substantial evidence where the opposition was a single homeowner's generalized fears to health and property values); *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1219 (11th Cir. 2002) (holding generalized concerns of citizens about aesthetics were insufficient to constitute substantial evidence, characterizing the point of law as permitting aesthetic concerns to support denial of a permit where there is substantial evidence of the visual impact of the tower before the board); *see also Verizon Wireless (VAW) LLC v. Douglas Cnty., Kan. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d 1218, 1249 (D. Kan. 2008) (explaining generalized "not in my backyard" opposition does not constitute substantial evidence); *SBA Commc'ns, Inc. v. Zoning Comm'n of the Town of Franklin*, 164 F. Supp. 2d 280, 293 (D. Conn. 2001) (holding conclusory assertions of residents do not constitute substantial evidence upon which a denial could be based).

MEMORANDUM DECISION AND ORDER - 31

used to collect the data is arbitrary agency action, and the findings based on [such a] study are unsupported by substantial evidence.") (quotation omitted); *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 949 (9th Cir. 2011) (discounting as reliable evidence surveys submitted by plaintiff because plaintiff failed to establish a "reliable methodology" was used in conducting the surveys); *City of Carlsbad*, 308 F. Supp. 2d at 1157 (affording the conclusions of the city's expert "virtually no weight at all" because no evidence in the record explains how the expert reached those conclusions).

Moreover, the record indicates those responding to the survey did not want to buy food from an organic farm "in the shadow" of a cell phone tower because they fear RF emissions cause adverse health effects. The TCA, however, prohibits local governments from basing their decision denying a permit for a wireless tower on "*direct or indirect*" concerns associated with the RF emissions' health effects. *City of Carlsbad*, 308 F. Supp. 2d at 1159 (emphasis added). Accordingly, the concern over the potential loss of customers "based on fear over RF emissions does not constitute a legitimate basis for an application denial under the TCA." *Id.* at 1162 (finding "the concern over property value depreciation based on fear over RF emissions [did] not constitute a legitimate basis for an application denial under the TCA").

As one court observed, it would completely frustrate the purpose of the TCA if objections raised by a small number of individuals – most of whom do not live anywhere near the proposed facility – could serve as a basis for denial:

> While the TCA is designed to preserve significant local authority, the thrust of the TCA is to increase competition in the telecommunications industry by preventing discriminatory and arbitrary conduct by local zoning boards relating to the placement, construction and modification of personal wireless service facilities. *See* 47 U.S.C. § 332(c)(7)(A). It would completely frustrate the purpose of the statute if the voicing of negative opinions by a small number of citizens, without more, could serve as a basis for denial. Any municipality could defeat the request

for a permit by simply making a very limited record that in the opinion of three or four citizens the tower would blight the landscape.

*Iowa Wireless Servs., L.P. v. City of Moline*, 29 F. Supp. 2d 915, 922-23 (C.D. Ill. 1998)

Similarly, in this case, the generalized and unsubstantiated concerns of a few citizens, particularly when those citizens do not even live close to the proposed tower, cannot constitute substantial evidence for the Board's denial of Intermax's CUP application.

In summary, the Court concludes substantial evidence does not support the Board's denial of Intermax's CUP application. For this reason, the Court does not reach the additional issue of whether the County's denial of the CUP application effectively prohibits wireless services under 47 U.S.C. § 332(c)(7)(B)(i)(II). *See Madera Cnty.*, 332 F. Supp. at 1313; *see also MetroPCS*, 400 F.3d at 724. For the same reason, the Court also does not address the County's argument that it did not violate the TCA's effective prohibition provision "because that section only applies to personal wireless service providers." (Dkt. 35 at p. 8).

## C.    Remedy

Intermax seeks an injunction directing the County to issue the relevant permits. "It has been held that where remand would serve no useful purpose, an order granting equitable relief in the nature of an injunction or mandamus to the local authority to issue the relevant permits is an appropriate remedy under the statute where a local zoning decision prohibiting a CUP is not supported by substantial evidence." *Madera Cnty.*, 332 F. Supp. at 1313 (citing *City of Saginaw*, 301 F.3d at 399-400; *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1220-22 (11th Cir. 2002); *Brehmer v. Planning Bd.*, 238 F.3d 117, 120-22 (1st Cir. 2001); *Omnipoint Corp.*, 181 F.3d at 409-10; *Oyster Bay*, 166 F.3d at 497). The Ninth Circuit has affirmed that an injunction is the proper remedy in such circumstances. *City of Anacortes*, 572 F.3d at 998 (holding that "the City's denial of the application without showing the existence of some potentially available and

technically feasible alternative constituted an effective prohibition of services, which the district court properly enjoined").

The TCA directs a district court to decide suits under the TCA on an expedited basis. 47 U.S.C. § 332(c)(7)(B)(v). A remand in this case would only delay its resolution and frustrate the TCA's purpose. Because substantial evidence does not support the Board's denial despite the County's extensive review of Intermax's CUP application, the Court grants Intermax's request for an injunction directing the Board to grant its application and to issue the necessary permits for the proposed tower's construction and operation.

## V. ORDER

IT IS ORDERED that:

1. Plaintiff Intermax Towers, LLC's Motion for Summary Judgment (Dkt. 30) on its claim for a violation under 47 U.S.C. § 332(c)(7) is **GRANTED** with respect to Intermax's claim that there was a lack of substantial evidence to support the denial of the conditional use permit within the meaning of 47 U.S.C. § 332(c)(7)(B)(iii) and (iv); the motion is otherwise **DENIED as moot**;

2. Defendants' Cross-Motion for Summary Judgment (Dkt. 35) is **DENIED**.

3. Intermax's counsel shall meet and confer with Defendants' legal counsel and shall submit a proposed final order granting the injunctive relief required in Intermax's Complaint ***no later than April 30, 2025.***

DATED: April 14, 2025

Amanda K. Brailsford
U.S. District Court Judge